# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER A. HARRIS, SR., | ) | |
| | ) | |
| Plaintiff, | ) | 3:14-cv-50373 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| HECTOR GARCIA, JILL WAHL, and | ) | |
| JAMES NIELSEN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher Harris, Sr., formerly an inmate at Dixon Correctional Center ("Dixon"), brings this lawsuit against three prison doctors and the prison's healthcare provider, Wexford Health Sources, Inc. ("Wexford"), alleging that Defendants were deliberately indifferent to pain he suffered from gynecomastia, a condition involving swelling of the breast tissue in men. Defendants have moved for summary judgment. For the reasons provided below, Defendants' motions [129] [132] are granted.

## Factual Background[1]

### I.    The Parties

Harris was an inmate at Dixon between 2010 and 2018. Defs. Wahl, Garcia, & Wexford's LR 56.1(a) Stmt. Facts ("Wexford Grp. Defs.' SOF"), ECF No. 131. Wexford employs physicians who provide medical care to prisons, including Dixon. *See id.* ¶¶ 2–4.

---

[1]     The following facts are undisputed or deemed admitted except where otherwise noted.

Dr. Jill Wahl is a physician licensed to practice in Illinois, board certified in family medicine. *Id.* ¶ 2. She worked for Wexford as a traveling medical doctor, including at Dixon, from 2007 through March 2015. *Id.*

Dr. Hector Garcia is a physician and Wexford's National Medical Director. *Id.* ¶ 3. In that role, he provides inpatient care, travels to different sites, and occasionally participates in "collegial reviews"—a process Wexford uses to approve requests for consultations and off-site treatment. *Id.* ¶¶ 3, 70–71.

Dr. James Nielsen is a physician licensed to practice in Illinois, board certified in psychiatry. *Id.* ¶ 4. He is an independent contractor who has worked with Wexford since 2004 or 2005, providing telemedicine services to prisons in Illinois. *Id.* These services consist of providing care through video conferencing equipment or similar means. Def. Nielsen's LR 56.1(a) Stmt. Facts ("Def. Nielsen's SOF") ¶ 6, ECF No. 134.

## II. Harris's Treatment History

Harris began seeing Dr. Nielsen in 2010 for mental-health treatment. Wexford Grp. Defs.' SOF ¶ 5. Among other medications, Dr. Nielsen prescribed Risperdal, an antipsychotic psychotropic medication that can cause "increased prolactin levels and gynecomastia." *Id.* ¶¶ 5–6. Gynecomastia is a "condition where a male develops an enlargement of breast tissue." *Id.* ¶ 7. It can cause discomfort due to engorgement of the affected tissues. *Id.* ¶ 8.

Harris developed gynecomastia after taking Risperdal. *Id.* ¶¶ 9–11. On June 10, 2010, he and Dr. Nielsen discussed the Risperdal prescription, including its role in his "complaints of breast tissue growth." *Id.* ¶ 9. Harris mentioned that he was "very uncomfortable" with his chest, and explained that it had been growing. *Id.* ¶ 10; Wexford Grp. Defs.' Ex. A, Harris Dep. at 31:14-15, ECF No. 131-1.

At Dixon, Dr. Nielsen's practice, qualifications, and privileges were restricted to treating mental illnesses and psychiatric problems. Def. Nielsen's SOF ¶¶ 11–12. His privileges and competence did not extend to the prescription of pain medication or the treatment of gynecomastia. *Id.* ¶¶ 13–14. As such, Dr. Nielsen had no role in assessing what medication Harris could or could not receive for his physiological conditions, including gynecomastia. *Id.* ¶¶ 15–18. According to Dr. Nielsen, gynecomastia is an issue typically treated at the health care unit by the primary health care physicians, who are able to prescribe pain medication. *Id.* ¶¶ 20–22.

For this reason, at their June 10 meeting, Dr. Nielsen directed Harris to "speak to primary care" regarding his concerns about his gynecomastia. Wexford Grp. Defs.' SOF ¶ 11; Wexford Grp. Defs.' Ex. D, Nielsen Dep., Ex. 1 at JN0062–63, 6/10/10 Mental Health Diagnostic & Treatment Note, ECF No. 131-10. This meant that Harris should use the "sick call" process at Dixon. Wexford Grp. Defs.' SOF ¶ 12.

To initiate the sick call process, an inmate submits a "request slip" to see a nurse. *Id.* Once an inmate does so, he is placed on a nurse's schedule for an initial consultation to see if the nurse can address his issues. *Id.* After three visits for the same issue, the inmate is referred to a physician, nurse practitioner, or physician's assistant. *Id.* Harris is familiar with this process and has utilized it in the past. *Id.*

Harris saw Dr. Nielsen again on August 9, 2010. *Id.* ¶ 14. Harris's prolactin level was elevated, which is indicative of hyperprolactinemia. *Id.* Dr. Nielsen discontinued Harris's Risperdal because Harris had stopped taking it and did not want to take it anymore. *Id.* He directed Harris to seek out assistance through sick call and also referred Harris to the health care unit.[2] *Id.* ¶ 16.

---

[2]     "Directing" a patient means to "inform[ ] the patient of the availability of the [sick call] process and urge[ ] them or direct[ ] them to take advantage of that process," while "referring" a patient means to

Even after Harris stopped taking the Risperdal, however, he noticed that the swelling in his chest did not subside, and his right nipple began to protrude. *Id.* ¶ 15. He saw Dr. Nielsen again on July 11, 2011, at which point Dr. Nielsen again directed Harris to seek out treatment through sick call. Def. Nielsen's SOF ¶ 28. Harris did not see Dr. Nielsen from the fall of 2011 until early 2013. Wexford Grp. Defs.' SOF ¶¶ 21, 23.

During this time, Harris did have several other medical appointments. For example, he saw Dr. Carter, a physician at the prison, and they discussed his prolactin level (although Harris may not have allowed Dr. Carter to conduct a physical exam). Pl.'s LR 56.1(b) Resp. Wexford Grp. Defs.' SOF ¶ 18, ECF No. 138.

Harris also saw Dr. Wahl on August 9, 2011. Wexford Grp. Defs.' SOF ¶ 20. Dr. Wahl addressed Harris's complaints of back pain, but there was no discussion of gynecomastia, breast tenderness, or breast enlargement. *Id.* Dr. Wahl saw Harris again for low back pain on April 19, 2012. *Id.* ¶ 22. Again, Dr. Wahl recorded no discussion of gynecomastia pain or discomfort at that appointment. Wexford Grp. Defs.' Ex. B, Wahl Dep. at 38:16-22, ECF No. 131-2.

Harris complained about his gynecomastia to Dr. Nielsen again on July 22, 2013. Wexford Grp. Defs.' SOF ¶ 24. Dr. Nielsen ordered a check of Harris's prolactin levels, directed Harris to go to sick call, and referred him to the health care unit for treatment. *Id.* The next day, Harris saw a registered nurse at the health care unit, but no discussion of gynecomastia was documented. *See* Pl.'s LR 56.1(b) Resp. Wexford Grp. Defs.' SOF ¶ 25. The day after that—July 24—Harris was given a sick call appointment. Wexford Grp. Defs.' SOF ¶ 26. Defendants contend that Harris refused this appointment, but Harris disputes this. *Id.*; Pl.'s LR 56.1(b) Resp. Wexford Grp. Defs.' SOF ¶ 26. Harris presented again for sick call on August 6, 2013, but no mention of gynecomastia

---

order or request that a patient be seen by someone in a specific clinic. Def. Nielsen's SOF ¶¶ 24–27; Wexford Grp. Defs.' Ex. D, Nielsen Dep. at 14:1–13, ECF No. 131-10.

was documented.  Pl.'s LR 56.1(b) Resp. Wexford Grp. Defs.' SOF ¶ 27.  He had two more appointments without any documented mention of gynecomastia—one on August 13, 2013, with Dr. Young Kim; and another on August 23, 2013, with Dr. Bessie Dominguez.  *Id.* ¶¶ 28–29.

On September 30, 2013, Harris saw Dr. Nielsen, who again referred him to the health care unit for treatment of his gynecomastia.  Wexford Grp. Defs.' SOF ¶ 30.  On November 8, Harris complained to Dr. Nielsen that he was dissatisfied with his primary care.  *Id.* ¶ 31.  Dr. Nielsen then referred Harris to the health care unit for the third time that year.  *Id.*; *see* Nielsen Dep., Ex. 1 at JN00032, 11/8/13 Mental Health Diagnostic & Treatment Note, ECF No. 131-11 ("Primary care referral (third) for rule out gynecomastia . . . .").

On November 14, Harris saw Dr. Dominguez for his complaints of gynecomastia.  Wexford Grp. Defs.' LR 56.1(b) Resp. Pl.'s Stmt. Add'l Facts ("Pl.'s SOAF") ¶ 16, ECF No. 141. Dr. Dominguez referred Harris to Dr. Wahl, suggesting that he receive a mammogram.  Wexford Grp. Defs.' SOF ¶ 34.

Dr. Wahl saw Harris on December 4, 2013—this time specifically for his gynecomastia. *Id.*  Her notes from the visit indicate that Harris had some firmness in his breasts, with his left breast firm below the nipple, and his right breast full without a discrete mass.  *Id.* ¶ 35.  She also noted that there was no nipple discharge.  *Id.*  Dr. Wahl assessed Harris as having "bilateral gynecomastia with left breast firmness."  *Id.* ¶ 36.  She told Harris that the growth was not cancerous or otherwise a problem.  *Id.* ¶¶ 36, 38.  Dr. Wahl testified that, in general, gynecomastia is not a serious condition and it can be monitored with physical exams.  *Id.* ¶ 67.  She did not believe surgery was necessary because gynecomastia is generally a cosmetic issue, and the potential risks of surgery outweigh the benefits.  *Id.* ¶¶ 38, 69.  Nevertheless, she referred Harris for an ultrasound, which is typically the first step to address breast irregularities.  *Id.* ¶ 37.

Several weeks later, on December 24, 2013, Dr. Wahl conducted a "collegial review" with Dr. Garcia concerning Harris's case. *Id.* ¶ 40. A "collegial review" consists of a phone call between a physician at the prison and a physician on the "collegial review team" at Wexford, whereby the on-site physician discusses and seeks approval for off-site medical care and treatment. *Id.* ¶¶ 70–71. After discussing Harris's condition, Dr. Garcia approved him for an on-site bilateral breast ultrasound. *Id.* ¶ 40. Dr. Garcia testified that an ultrasound is used for gynecomastia patients to rule out tumors; if there is no tumor, the only treatment is cosmetic surgery. *Id.* ¶ 68.

The ultrasound took place on February 4, 2014. *Id.* ¶ 42. It showed "prominent glandular tissue in the retroareolar regions of both breasts, consistent with gynecomastia." *Id.* Dr. Wahl and Dr. Garcia conducted another collegial review following the ultrasound, on February 19. *Id.* ¶ 43. They discussed whether Harris should undergo a mammogram. *Id.* Dr. Wahl, however, reported that she had not noticed a mass in Harris's breast. *Id.* ¶ 44.

At the conclusion of their discussion, Dr. Wahl and Dr. Garcia determined that Harris's gynecomastia was benign in nature. *Id.*; *see* Wexford Grp. Defs.' Ex. C, Garcia Dep. at 57:16-23, 70:3-5, ECF No. 131-9. They decided not to move forward with a mammogram and to follow up on Harris's case in six months, if necessary. Wexford Grp. Defs.' SOF ¶ 44. Dr. Wahl later testified that Harris did not need immediate attention because his gynecomastia presented as a fairly typical cosmetic condition. *Id.* ¶ 45.

On March 18, 2014, Harris saw Dr. Nielsen, who again directed him to follow up with his primary care physician. *Id.* ¶ 46. The same day, Harris saw Dr. Wahl for a follow-up to discuss the results of his ultrasound. *Id.* ¶ 47. Dr. Wahl made a note of Harris's prolactin levels and conducted a physical exam. *Id.* ¶¶ 47–48. She concluded that Harris had bilateral breast fullness, but no "discrete nodules and no axillary nodules." *Id.* ¶ 48. There was no significant change in

his condition. *Id.* Because Harris's prolactin levels were elevated, Dr. Wahl ordered them to be checked again. *Id.* And, because his condition had not changed, she did not think Harris needed a mammogram or surgery. *Id.*

Dr. Wahl saw Harris again for follow-up on May 15, 2014. *Id.* ¶¶ 50–51. Harris reported tenderness on his left side as well as back pain. *Id.* ¶ 50. Dr. Wahl conducted another physical exam, noting again that Harris had bilateral gynecomastia with no discrete nodules. *Id.* Because Harris's condition had not changed, Dr. Wahl did not believe he needed a mammogram or surgery. *Id.* However, she requested a follow-up for his back pain and a follow-up in six months for his gynecomastia. *Id.* ¶ 51. She also ordered 650 milligrams of Tylenol. *Id.*

Harris did not see Dr. Wahl again, but he kept Dr. Nielsen apprised of the status of his gynecomastia. *Id.* ¶¶ 52–57. On May 27, 2014, Harris told Dr. Nielsen that he had been evaluated by the medical staff for issues related to breast tissue changes. *Id.* ¶ 54. On February 24, 2015, Harris complained to Dr. Nielsen about breast tenderness, and Dr. Nielsen referred him to the health care unit.[3] *Id.* ¶ 55; Pl.'s SOAF ¶ 16, ECF No. 138. On March 24, 2015, Dr. Nielsen again referred Harris to the health care unit for treatment of his gynecomastia. Wexford Grp. Defs.' SOF ¶ 56. And on May 5, Dr. Nielsen called the health care unit directly about Harris's breast complaints. *Id.* ¶ 57. Dr. Nielsen recalls explaining to a sick-call nurse that Harris was complaining of breast symptoms and would be discharged from the prison soon, and asking to schedule him for an appointment. *Id.*

---

[3]    Dr. Nielson's retained expert, Dr. Scott Levine, testified that Dr. Nielsen entered a referral on this date. Pl.'s SOAF ¶ 16; *see* Def. Nielsen's Ex. 5, Levine Dep. at 6:10-22, ECF No. 134-5. Although the other Defendants deny this statement of fact, they do not specifically dispute the occurrence of the February 24 referral. *See* Wexford Grp. Defs.' LR 56.1(b) Resp. Pl.'s SOAF ¶ 16. Accordingly, this fact is deemed admitted.

On May 7, 2015, nurse practitioner Susan Tuell followed up with Harris about his gynecomastia. *Id.* ¶ 58. Tuell noted that Harris had previously undergone an ultrasound, that both his breasts were enlarged, and that he had no masses, nodules, nipple discharge, or axillary adenopathy. *Id.* ¶¶ 58–59. She instructed Harris to follow up "as indicated" and found no reason to change his medication. *Id.* ¶ 59. Harris saw Tuell again on May 27, 2015, but Tuell still saw no reason to change Harris's prescription for Tylenol at that time. *Id.* ¶¶ 60–61.

### III. Referral Follow-Up Policy & Application

At this point, it would be helpful to review Dixon's policy regarding the processing of referrals. Christine Peppers, a registered nurse at Dixon, explained her practice of following up on referrals. Dr. Nielsen's orders, she said, would come in a stack that she would review. Pl.'s LR 56.1(b) Resp. Wexford Grp. Defs.' SOF ¶ 31. If the order was for a primary-care follow-up, Peppers would put the patient's name in the "M.D. Appointment Book." *Id.* But she would only enter a name in the book if it was not listed there already, either because Peppers had missed a referral order or because it was a brand-new referral order. Wexford Grp. Defs.' Ex. F, Peppers Dep. at 26:18–27:4, ECF No. 131-13. Peppers's duties did not include scheduling follow-up appointments from the appointment book. Pl.'s LR 56.1(b) Resp. Wexford Grp. Defs.' SOF ¶ 31.

The parties dispute whether Dixon's medical staff saw Harris as a result of Dr. Nielsen's referrals. Peppers testified that she did not have any independent recollection of responding to Dr. Nielsen's July or September 2013 referrals. Pl.'s SOAF ¶ 20; *see* Peppers Dep. at 33:18-22. Furthermore, she stated that she understood Dr. Nielsen's note in November 2013—"Primary care referral (third) for rule out gynecomastia"—to mean that he was "questioning whether" the earlier two orders "had been responded to." Pl.'s SOAF ¶ 20; *see* Peppers Dep. at 32:18–33:14. She

explained, however, that if she had not followed up on the July and September orders, that would have deviated from her standard practice. Pl.'s SOAF ¶ 20.

Harris points to the testimony of Dr. Nielsen's expert, Dr. Levine, who stated that there is no evidence that Harris was seen as a direct result of Dr. Nielsen's referrals in September 2013, November 2013, or February 2015. *Id.* ¶ 16. Dr. Levine explained that the lack of a "working functioning system" for referrals can be harmful to patients because, "[i]f a patient is not obtaining medically needed services, that can cause harm." *Id.* ¶ 18; Levine Dep. at 14:23–15:7.

Defendants respond that Harris was seen by medical staff on July 23, August 6, August 13, and August 23, 2013—four times between Dr. Nielsen's July and September 2013 referrals. Wexford Grp. Defs.' LR 56.1(b) Resp. Pl.'s SOAF ¶¶ 16, 20. They note that Harris's gynecomastia could have been addressed at those appointments, if he had brought it up. *See id.* Furthermore, they explain, Harris was seen on November 14, 2013, by a medical doctor—one week after Dr. Nielsen's November 8 referral. Wexford Grp. Defs.' SOF ¶ 32.

## IV. Harris's Ongoing Symptoms and Need for Pain Relief

Harris says that his gynecomastia causes him discomfort when lying on his chest or washing it, when playing basketball, or when bending over to tie his shoes. *Id.* ¶ 63. The pain, he says, can bring tears to his eyes and requires him to limit his activities.[4] Pl.'s SOAF ¶ 1.

For their part, Defendants dispute the extent to which Harris informed them of his pain or sought pain medication. According to Harris, during the years of 2011 through 2015, he "requested from prison medical staff at Dixon Correctional Center, on at least a monthly basis, pain relief

---

[4] Defendants dispute that Harris's condition restricts his activities, pointing to his deposition testimony about playing basketball and working as a "porter," which involved cleaning, sweeping, and mopping. *See* Wexford Grp. Defs.' LR 56.1(b) Resp. Pl.'s SOAF ¶ 1. But it is not clear from Harris's testimony that he participated in either of these activities while suffering from gynecomastia; in fact, his testimony about basketball indicates that his chest hurt too much while trying to play. Harris Dep. at 71:3–19.

medication." *Id.* ¶ 22. Dr. Nielsen agreed that he remembered Harris saying his gynecomastia was uncomfortable. Wexford Grp. Defs.' SOF ¶ 64. Dr. Wahl, who saw Harris for the first time in December 2013, did not document any mention of pain at that appointment. Pl.'s LR 56.1(b) Resp. Wexford Grp. Defs.' SOF ¶ 34. She agrees, though, that she told Harris she would provide him with some Tylenol. Wexford Grp. Defs.' SOF ¶ 39. At their next appointment in March 2014, Harris told Dr. Wahl that he had mildly sore breasts, but she did not write him a prescription for Tylenol because it was available at the commissary. *Id.* ¶¶ 47, 49. She did, however, write Harris a prescription for Tylenol at their final appointment in May 2014. *Id.* ¶ 51. As for Dr. Garcia, the undisputed evidence shows that he was unaware of Harris's pain complaints. Pl.'s LR 56.1(b) Resp. Wexford Grp. Defs.' SOF ¶ 44.

Defendants point out that Tylenol was available at the prison's commissary even before Dr. Wahl prescribed it in May 2014—which Harris admits. *See id.* ¶¶ 49, 51. Harris, however, says he "asked for medication . . . unlike aspirin or Tylenol which caused him vomiting and stomach pain, but was never given it." Pl.'s SOAF ¶ 22. The evidence he cites, however, does not show that he ever asked Defendants for something other than aspirin or Tylenol. Rather, in his deposition, Harris testified that he had told a different, unnamed doctor that Tylenol was "not working," *see* Harris Dep. at 47:18–48:17, and that he had a "problem with" aspirin and was not receiving pain medications, *see id.* at 55:14-19, 75:9–21. In any event, Harris received prescriptions for five different pain medications and two muscle relaxers during the period from April 2011 to December 2015. Wexford Grp. Defs.' LR 56.1(b) Resp. Pl.'s SOAF ¶ 22; *see* Wexford Grp. Defs.' Ex. H, Medication Administration Record, ECF No. 141-1.

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

Moreover, Rule 56 requires the district court to grant a motion for summary judgment after discovery "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of establishing that there is no genuine issue of material fact. *See id.* Once the moving party has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmoving party must then set forth specific facts showing that there are disputed material facts that must be decided at trial. *See id.* at 321–22.

<u>**Analysis**</u>

Harris claims that Drs. Nielsen, Wahl, and Garcia were deliberately indifferent to his need for treatment and relief from pain. He further contends that Wexford failed to maintain an effective policy for entering referrals from physicians, thereby exacerbating his problems. Wexford, Dr. Garcia, and Dr. Wahl have filed a joint motion for summary judgment, while Dr. Nielsen has filed a separate motion. The Court addresses each of Defendants' arguments accordingly.

## I. Deliberate Indifference Claims against the Physician Defendants

Turning first to his deliberate indifference claims against the doctors, Harris must show that (1) he was suffering from an objectively serious medical condition, and (2) the defendants were deliberately indifferent to this condition. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Deliberate indifference requires "more than negligence, rather the defendant must meet essentially a criminal recklessness standard, that is, ignoring a known risk." *Armato v. Grounds*, 766 F.3d 713, 721 (7th Cir. 2014) (internal quotation marks and citation omitted). This analysis requires the Court to "look at the totality of [Harris's] medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc)).

### A. Objectively Serious Medical Condition

Wexford, Garcia, and Wahl contend that Harris's gynecomastia was not an objectively serious medical need requiring their attention. A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would know that a doctor's attention was needed. *Edwards v. Snyder*, 478 F.3d 827, 830–31 (7th Cir. 2007); *Foelker v. Outagamie Cty.*, 394 F.3d 510, 512–13 (7th Cir. 2005). A condition is also

objectively serious if "failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008).

Wexford, Garcia, and Wahl point out that Harris's gynecomastia required only a minimally invasive diagnostic test (the ultrasound) and no other treatment. Furthermore, they note, Harris delayed seeking treatment for long periods of time and went to numerous medical appointments without bringing up his gynecomastia symptoms at all. Finally, they argue, the record shows that Harris's condition was not serious because he had no tumors, masses, nodules, or discharge.

While all this is true, other evidence could lead a reasonable jury to believe that Harris's condition was sufficiently painful to constitute an objectively serious medical condition. Pain that is chronic and substantial, or that significantly affects an individual's daily activities, qualifies as a serious medical condition. *Id.* at 522–23. According to Harris, his condition causes such severe pain that he is unable to sleep, lay on his chest, or wash his chest. And, at times, the pain is so bad that it brings tears to his eyes and causes him to forego participating in certain activities. Although Defendants dispute Harris's accounts of his pain as self-serving, his credibility is a question for the jury. *See Payne v. Milwaukee Cty.*, 146 F.3d 430, 432 (7th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The fact that Dr. Wahl concluded that Harris's gynecomastia required regular six-month appointments to monitor its progress further supports Harris's position that his condition was objectively serious.[5]

---

[5]     Wexford, Garcia, and Wahl also argue that, because Harris "accepted the risk" of developing gynecomastia as a result of taking Risperdal, it is not a serious medical condition, citing *Williams v. Kelly*, No. 15-cv-81365, 2018 WL 1911820 (N.D. Ill. Apr. 23, 2018). *See* Wexford Grp. Defs.' Mem. Supp. Mot. Summ. J. at 5, ECF No. 130. But *Williams* does not stand for the proposition that a medical condition is not serious if an inmate accepts its possibility before it occurs. Rather, the court in *Williams* considered whether a doctor is deliberately indifferent for failing to explain the possibility of certain side effects, a circumstance not at issue in this case. *See Williams*, 2018 WL 1911820 at *4–5.

## B.    Deliberate Indifference

Next, Harris argues that Drs. Nielsen, Garcia, and Wahl acted with deliberate indifference in their treatment of his gynecomastia, particularly in their failure to provide him with pain medication.  Each of the doctors argues that they provided adequate care within the scope of their professional competence and involvement in Harris's case.  Although Harris discusses all three professionals in one fell swoop, it is necessary to assess each physician individually.

### i.    Dr. Nielsen

Harris argues that Dr. Nielsen acted with deliberate indifference by failing to prescribe him pain medication, despite Harris's numerous complaints over the years about pain in his breasts.  Dr. Nielsen responds that, as a psychiatrist whose privileges and competence were limited to providing mental health care, he could not personally provide pain medication to Harris.  Harris seemingly agrees with this assertion.  *See* Pl.'s LR 56.1(b) Resp. Def. Nielsen's SOF ¶¶ 12–18 (agreeing that Dr. Nielsen's practice was limited to mental health care and that the prescription of pain medication, treatment of gynecomastia, and assessment of the necessity of medication was outside the scope of Dr. Nielsen's practice and competence).  Nevertheless, Harris argues that Dr. Nielsen could have prescribed him pain medication because he is a licensed physician.

Harris's proposition that Dr. Nielsen had the duty and ability to prescribe pain medication merely by virtue of his status as a physician finds no support in the record.  Regardless of what Illinois law may have *permitted* Dr. Nielsen to do, the undisputed evidence shows that he did not have the competence or authority to assess what medication was needed for Harris's gynecomastia or to prescribe pain medication.  Furthermore, the undisputed record supports Dr. Nielsen's contention that he reasonably relied on other medical professionals at Dixon, such as Harris's doctors in the health care unit, whose job it was to treat Harris's gynecomastia.

Harris's argument that Dr. Nielsen should have *recommended* that he be given pain medication is equally suspect. Prescribing pain medicine simply was not Dr. Nielsen's role, and accordingly, it was reasonable for him to leave this decision to other medical professionals who had the authority to do so. *See Mitchell v. Kallas*, 895 F.3d 492, 498–99 (7th Cir. 2018) (explaining that a defendant who had no authority to provide the alleged necessary care could not be held liable for failing to provide that care); *see also Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015) (noting that deliberate indifference requires a showing that a medical professional had the capability and responsibility to care for the inmate's serious condition).

What is more, Dr. Nielsen responded adequately to Harris's complaints of breast pain, by frequently referring Harris to the health care unit and reminding Harris that he could go to sick call on his own to address his condition. Yet, Harris contends that even these actions of Dr. Nielsen amounted to deliberate indifference because the doctor should have known that his referrals were not resulting in appointments. It is true, as Harris points out, a physician may be liable for deliberate indifference by "continuing with a course of treatment that [is] ineffective." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). But there is no evidence that Dr. Nielsen knew his referrals were not being heeded. *See Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012) (concluding that a physician was not liable for deliberate indifference for continuing with a course of treatment that physician was unaware was ineffective).

Furthermore, Harris did receive frequent medical appointments around the same times that he saw Dr. Nielsen, whether they arose out of Dr. Nielsen's actions or not. For instance, Harris had a medical appointment related to his gynecomastia on November 14, 2013. *See* Wexford Grp. Defs.' LR 56.1(b) Resp. Pl.'s SOAF ¶ 16. Furthermore, Harris had previously seen medical staff on July 23, August 6, August 13, and August 23, 2013. *Id.* ¶¶ 16, 20; Wexford Grp. Defs.' SOF

¶ 32.  Harris points to no evidence that his gynecomastia complaints could not have been addressed at these appointments, or any reason why Dr. Nielsen would have believed that Harris's medical needs were going unaddressed.

By contrast, there was a longer delay after Dr. Nielsen's February 2015 referral.  *See id.* ¶¶ 55–57.  But there is no evidence that Dr. Nielsen responded any way but appropriately once he found out—he issued another referral on March 24 and called the health care unit on May 5 when it appeared that Harris still had not received an appointment.  *Id.*  Harris ultimately saw nurse practitioner Tuell on May 7.  *See id.* ¶ 59.  Harris does not explain what more Dr. Nielsen could have done to ensure that he was seen in a reasonable time.  Moreover, even if Dr. Nielsen could have taken additional steps, there is no evidence that he had any control over the scheduling of appointments or any ability to speed up that process.  *See Mitchell*, 895 F.3d at 499.

Based upon the above, no reasonable jury could find that Dr. Nielsen's actions in referring him to medical providers departed so substantially from "accepted professional judgment, practice, or standards, as to demonstrate" deliberate indifference.  *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013).  The Court therefore grants Dr. Nielsen's motion for summary judgment.

### ii.  Dr. Wahl

Next, Harris argues that Dr. Wahl's treatment constituted deliberate indifference.  He contends that she "never prescribed pain relief medication," thereby exacerbating the pain he experienced from his gynecomastia.  Pl.'s Resp. Opp. Defs.' Mots. Summ. J. at 6, ECF No. 139. This assertion, of course, is flatly contradicted by the record and Harris's own admissions— Dr. Wahl prescribed Tylenol to Harris on May 15, 2014.  *See* Pl.'s LR 56.1(b) Resp. Wexford Grp. Defs.' SOF ¶ 51.

To the extent Harris means to argue that Dr. Wahl unnecessarily delayed providing him with Tylenol, he fails to refute the fact that Tylenol was available at the commissary for purchase, or assert that he lacked the means or ability to purchase it. *See id.* ¶ 49. A delay in treatment is not actionable unless the condition worsens because of the delay, or if unnecessary pain results. *Mitchell*, 895 F.3d at 500; *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009). Here, because Tylenol was available to Harris with or without Dr. Wahl's prescription, any delay caused by her failure to prescribe Tylenol at the first appointment does not support his claim.

That said, to the extent Harris means to argue that Dr. Wahl should have provided him with something *other* than Tylenol because of his stomach complaints, he points to no evidence that she was aware of this issue. Accordingly, Harris cannot show that Dr. Wahl ignored a known condition, or that she deliberately proceeded with ineffective treatment. *See Holloway*, 700 F.3d at 1074.

In the end, Dr. Wahl provided appropriate care for Harris's gynecomastia by conducting physical exams, ordering an ultrasound, and scheduling multiple follow-up appointments.[6] Furthermore, she responded appropriately to Harris's complaints of pain by noting the availability of pain relief at the commissary and even prescribing him pain medicine directly. Thus, a reasonable jury could not find that Dr. Wahl departed so drastically from the standard of care as to have made no professional medical judgment at all. *See McGee*, 721 F.3d at 481. The Court therefore enters summary judgment in favor of Dr. Wahl.

### iii. Dr. Garcia

Harris admits that Dr. Garcia's involvement in his case was "limited to a telephone conversation with Dr. Wahl, without any contact whatsoever with Mr. Harris or any review of Mr.

---

[6] Harris does not argue that Dr. Wahl was deliberately indifferent for any reason other than her failure to order pain medication; for instance, he takes no issue with her decision not to order a mammogram or cosmetic surgery.

Harris' medical records." Pl.'s Mem. Opp. Defs.' Mots. Summ. J. at 6. Still, he contends that Dr. Garcia was deliberately indifferent because he "neither recommended nor prescribed any pain medication." *Id.*

Harris's deliberate indifference claim against Dr. Garcia fails for the simple reason that he cannot show that Dr. Garcia was even *aware* of his need for pain relief, much less that Dr. Garcia acted with deliberate indifference in failing to recommend it. *See* Pl.'s LR 56.1(b) Resp. Wexford Grp. Defs.' SOF ¶ 44. A treater cannot be deliberately indifferent to a condition of which he is unaware. *See Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) (noting that deliberate indifference requires proof that an official knew of and disregarded an excessive risk to inmate health).

Moreover, like Dr. Nielsen, Dr. Garcia was entitled to rely on the judgment of Dr. Wahl and the other health care unit staff. As Harris acknowledges, Dr. Garcia's only involvement in his case was approving the ultrasound; he did not meet with Harris or treat him. Accordingly, Dr. Garcia was not "responsible for providing" care to Harris, and did not "do nothing" despite that responsibility. *Dobbey*, 806 F.3d at 940. Rather, Dr. Garcia did everything asked of him to advance Harris's treatment, by approving Dr. Wahl's request for an ultrasound and then discussing with her the results of that ultrasound. A reasonable jury could not find that Dr. Garcia acted with deliberate indifference, and the Court enters summary judgment in his favor.

## II.   *Monell* Claim Against Wexford

Finally, Harris contends that Wexford's lack of an appropriate policy regarding scheduling appointments after a physician provides a referral constitutes deliberate indifference. Harris's claim against Wexford falls under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which applies to private corporations, like Wexford, that have contracted to provide essential government services. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017). Under

*Monell*, Harris must show that his constitutional injury was caused by "(1) the enforcement of an express policy of the [corporation], (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Latuszkin v. City of Chi.*, 250 F.3d 502, 504 (7th Cir. 2001). Wexford argues that it cannot be liable under this standard because there is no evidence that it has a widespread policy or practice of ignoring physician referrals or that Harris suffered any injury as a result of such a policy.

Even if the Court were to assume that Wexford lacked an adequate policy to deal with referrals, there is no evidence that Harris suffered as a result. Harris argues that the delays between referrals and follow-up appointments exacerbated his condition or unnecessarily prolonged his pain. *See Mitchell*, 895 F.3d at 500; *Knight*, 590 F.3d at 466. But he does not point to any specific delays or explain how they affected him. Instead, the totality of the evidence reflects that Harris was seen regularly by medical staff, whether because of referrals or not. For instance, after Dr. Nielsen's referrals in July, September, and November 2013, Harris saw medical staff multiple times. *See* Wexford Grp. Defs.' LR 56.1(b) Resp. Pl.'s SOAF ¶¶ 16, 20; Wexford Grp. Defs.' SOF ¶ 32. He does not dispute that he could have brought up his gynecomastia complaints, including pain, at those appointments.

In addition, even if there were some delays following referrals, there is no evidence that those delays exacerbated Harris's injury or caused unnecessary pain. For instance, although several months passed after Dr. Nielsen's February 2015 referral before Harris was seen in May 2015, he had already been prescribed Tylenol at that point by Dr. Wahl. And Tuell saw no reason to change that prescription on May 7, rebutting the inference that the two-month delay had any effect on Harris's condition or pain. Moreover, as Defendants point out, Harris had near-constant prescriptions for pain medications and muscle relaxers for the entire relevant time period, and

Tylenol was available at the commissary. *See* Wexford Gr. Defs.' SOF ¶ 49; Wexford Grp. Defs.' LR 56.1(b) Resp. Pl.'s SOAF ¶ 22. Accordingly, the Court concludes that a reasonable jury could not find that Wexford's system of scheduling appointments following referrals caused Harris any injury of constitutional scope.

Additionally, even if delays *did* exacerbate or prolong Harris's pain, he cannot point to any facts to support his claim that these delays were the result of a widespread pattern or practice, as opposed to individual oversights and omissions. As Peppers testified, she had a system in place for bringing referrals to the prison doctors' attention—she would put them in the "M.D. Appointment Book," and doctors would schedule follow ups and highlight prisoners' names once they were seen.

Harris concedes that, if a referral was not put in the book, that would be a *deviation* from Peppers's usual practice. *See* Pl.'s SOAF ¶ 20. Yet he puts forward no evidence that such deviations were common outside of his own experience. "[A] showing of isolated incidents does not create a genuine issue as to whether defendants have a general policy or a widespread practice of an unconstitutional nature." *Palmer v. Marion Cty.*, 327 F.3d 588, 597 (7th Cir. 2003). Nor does Harris put forward any evidence that physicians consistently failed to schedule appointments from the referrals in the M.D. Appointment Book.

Because a practice existed for scheduling appointments from referrals, Harris's reliance on *Glisson*, 849 F.3d at 379–80, is unavailing. There, the evidence indicated that officials were aware of the need for a coordinated-care policy, but deliberately failed to put any such policy in place. *See id*. Here, there is no evidence that Wexford failed to put in place a system for scheduling appointments for referrals, or that there was a widespread practice of ignoring referrals. Furthermore, even if Wexford's referral practices were lacking in some respects, there is no

evidence that those shortcomings exacerbated Harris's gynecomastia or needlessly prolonged his pain. Accordingly, the Court enters summary judgment on behalf of Wexford.

## Conclusion

For the reasons stated herein, Defendants' motions for summary judgment are granted. Judgment shall enter in Defendants' favor. Civil case terminated.

**IT IS SO ORDERED.**                    ENTERED:  9/19/19

_____
**JOHN Z. LEE**
**United States District Judge**